LYNN M. DEAN (Cal. Bar No. 205562)
Email: deanl@sec.gov
DoHOANG T. DUONG (Cal. Bar No. 219127)
Email: duongdo@sec.gov

Michele Wein Layne, Regional Director
Amy J. Longo, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

Attorneys for Plaintiff
Securities and Exchange Commission

EDWARD GARTENBERG (Cal. Bar No. 102693)
egartenberg@gghslaw.com
MILENA DOLUKHANYAN (Cal Bar No. 303157)
mdolukhanyan@gghslaw.com
Gartenberg Gelfand Hayton LLP
15260 Ventura Boulevard, Suite 1920
Sherman Oaks, California 91403
Telephone: (213) 542-2100
Facsimile: (213) 542-2101

Attorneys for Defendants,
Tweed Financial Services, Inc. and Robert Russel Tweed

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>TWEED FINANCIAL SERVICES, INC. and ROBERT RUSSEL TWEED,<br><br>Defendants. | Case No. 2:17-cv-07251-FMO-E<br><br>**PARTIES' JOINT SUBMISSION FOR PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date: August 15, 2019<br>Time: 10:00 a.m.<br>Ctrm: 6D<br>Judge: Hon. Fernando M. Olguin |

# **TABLE OF CONTENTS**

I.   INTRODUCTORY STATEMENTS.................................................................1

    A.   The SEC's Introduction.....................................................................1

    B.   The Defendants' Introduction ...........................................................2

II.  POINTS OF CONTENTION ....................................................................5

    A.   Did Defendants Violate Section 206(4) of the Advisers Act  and Rule 206(4)-8 Thereunder?...................................................................5

        1.   The SEC's Position ...................................................................5

            a.   The Legal Standard for a Violation of Section 206(4) of the Advisers Act and Rule 206(4)-8...................................5

            b.   Tweed and TFSI Are Investment Advisers .....................7

            c.   Tweed and TFSI Breached Their Fiduciary Duties.........7

            d.   Tweed and TFSI Made Materially False Statements ......8

                i.   False Statements and Omissions Regarding the QAMF Investment.....................................................9

                ii.  False Statements and Omissions Regarding the Teamwork Retail Investment ...............................13

            e.   Tweed and TFSI were the "makers" of the false statements ...................................................................15

            f.   The Misrepresentation and omissions were material ....16

            g.   Tweed and TFSI Employed Deceptive Practices.........17

            h.   Defendants Cannot Claim Reliance on Professionals  As a Defense ..................................................................18

        2.   The Defendants' Position.........................................................19

            a.   The Fiduciary Duty Claim was Never Pled and Accordingly Cannot be Considered on a Motion for Summary Judgment ......................................................19

            b.   The Claims Alleging Material False Statements Present Mixed Questions of Law and Fact to be Tried.............20

            c.   Tweed Did Not Make False Statements or Omissions Regarding the QAMF Investment or Teamwork Retail Loan ...........................................................................21

                i.   Summary of the QAMF Investment in the Relevant Quarterly Reports were Not Falsely Valued ...............................................................21

i

ii.  The QAMF Investment was Reasonably Valued Reasonably ...................................................23

d.  The Quarterly Statements were Prepared by Certified Public Accountants – Not by Tweed ...........................24

i.  The QAMF Investment Valuations on the Quarterly Reports Were Reasonable ..................25

ii.  Summary of the Teamwork Retail Loan .............27

iii.  The Teamwork Retail Loan was Reasonably Valued ......................................................28

iv.  There were No Material Omissions in the Quarterly Reports ...........................................30

e.  Defendants Were Not the Authors of the Quarterly Reports -- Whether Either of the Defendants Qualified as a "Maker" Is a Triable Issue .........................................31

f.  Materiality Is a Triable Issue. .......................................32

g.  Reliance on Professionals Is a Triable Issue ................32

h.  Whether the Defendants were "Investment Advisers" with Respect to the Matters at Issue Is a Triable Issue .32

i.  The Defendants Did Not Employ Deceptive Devices...34

B.  Did Tweed Aid and Abet TFSI's Violations?....................................36

1.  The SEC's Position ......................................................36

2.  The Defendants' Position ..............................................38

C.  The SEC's Request for Permanent Injunctions...............................40

1.  The SEC's Position ......................................................40

2.  The Defendants' Position ..............................................41

D.  The SEC's Request for Civil Penalties .............................................42

1.  The SEC's Position ......................................................42

2.  The Defendants' Position ..............................................44

# <u>TABLE OF AUTHORITIES</u>

## <u>CASES</u>

*Abrahamson v. Fleschner,*
   568 F.2d 862, 870 (2d Cir. 1977) ...................................................................7, 33

*Ambat. v. City & County of San Francisco,*
   757 F.3d 1917 (9th Cir. 2014) ...................................................................................5

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds,*
   __U.S.__, 133 S. Ct. 1184, 1195-96 (2013) ......................................................6

*Basic Inc. v. Levinson,*
   485 U.S. 224 (1988) .................................................................................................6

*Brant v. CCG Financial Corp.,*
   693 F. Supp. 889  (D.Or. 1988) ............................................................................39

*Durning v. First Boston Corp.,*
   815 F.2d 1265 (9th Cir. 1987) ...............................................................................20

*FEC v. Williams,*
   104 F.3d 237 (9th Cir. 1996) ....................................................................................2

*Fecht v. Price Co.,*
   70 F.3d 1078 (9th Cir. 1995) .................................................................................20

*Gabelli v. SEC,*
   568 U.S. 442 (2013) .............................................................................................2, 23

*In re ChinaCast Educ. Corp. Sec. Litig.*
   809 F.3d 471 (9th Cir. 2015) .................................................................................40

*Janus Capital Group, Inc. v. First Derivative Traders,*
   564 U.S. 135 (2011) ...........................................................................................15, 31

*Kenton Capital*
   69 F. Supp. 2d 1 (D.D.C. 1998) .............................................................................42

*Provenz v. Miller,*
   102 F.3d 1478 (9th Cir. 1996) ...............................................................................19

*Schreiber v. Burlington Northern, Inc.,*
   472 U.S. 1 (1985) ....................................................................................................35

*SEC v. Abacus Int'l Holding Corp.*
   No. C 99–02191, 2001 WL 940913 (N.D. Cal. Aug.11, 2001) .........................43

*SEC v. Apuzzo*
   689 F.3d 204 (2d Cir. 2012) ..................................................................................36

*SEC v. Blavin*
   760 F.2d 706 (6th Cir. 1985) ...................................................................................6

iii

*SEC v. Capital Gains Research Bureau, Inc.,*
   375 U.S. 180 (1963)........................................................................8

*SEC v. CMKM Diamonds, Inc.,*
   635 F. Supp. 2d 1185 (D. Nev. 2009) ...........................................43

*SEC v. Credit Bancorp, Ltd.,*
   195 F. Supp. 2d 475 (S.D.N.Y. 2002) ..........................................16

*SEC v. DiBella,*
   No. 3:04-cv-1342 (EBB), 2007 WL 2904211 (D. Conn. Oct. 3, 2007).............8

*SEC v. Fehn,*
   97 F.3d 1276 (9th Cir. 1996) ..........................................36, 40, 41

*SEC v. Goldfield Deep Mines,*
   758 F.2d 459 (9th Cir.1985) ..........................................................19

*SEC v. Koracorp Indus., Inc.,*
   575 F.2d 692 (9th Cir. 1978) .......................................................40

*SEC v. Kotrozo,*
   2006 U.S. Dist. LEXIS 96795 (C.D. Cal. 2006) ..........................42

*SEC v. Lowe,*
   556 F. Supp. 1359 (E.D.N.Y. 1983) ...........................26, 30, 31

*SEC v. Manor Nursing Ctrs.*
   458 F.2d 1082 (2d Cir. 1979) ......................................................40

*SEC v. Moran*
   922 F. Supp. 867 (S.D.N.Y. 1996)), aff'd, 587 F.3d 553 (2d Cir. 2009)...........8

*SEC v. Murphy*
   626 F.2d 633 (9th Cir. 1980) ...........................16, 40, 41, 42, 43

*SEC v. Palmisano*
   135 F.3d 860 (2d Cir. 1998) .......................................................42

*SEC v. Platforms Wireless,*
   617 F.3d 1072 (9th Cir. 2010) ......................................................6

*SEC v. Rabinovich & Associates, LP,*
   2008 U.S. Dist. LEXIS 93595 (S.D.N.Y. Nov. 18, 2008) ...........9, 16

*SEC v. Research Automation Corp.,*
   585 F.2d 31 (2d Cir. 1978)..........................................................16

*SEC v. Retail Pro. Inc.,*
   2010 WL 1444993 (S.D. Cal. Apr. 9, 2010) ...............................19

*SEC v. Steadman*
   967 F.2d 636 (D.C. Cir. 1992)........................................................6

*SEC v. Todd,*
   642 F.3d 1207 (9th Cir. 2011) ....................................................20

iv

*Transamerica Mortgage Adviser, Inc. v. Lewis*
    444 U.S. 11, 17 (1979) ...................................................................8

*TSC Indus. v. Northway,*
    426 U.S. 438 (1976)......................................................6, 7, 20, 31

*U.S. v. Elliott*
    62 F.3d 1304 (11th Cir. 1996) ...............................................7, 33

*U.S. v. Tull,*
    481 U.S. 412 (1987)...............................................................43

*Wallent v. Bendelac,*
    2005 Bankr. LEXIS 3484 (Bankr.S.D.N.Y. 2005)......................33, 34

*Wang v. Gordon,*
    715 F.2d 1187 (7th Cir. 1983) ...........................................34

*Wright v. Schock,*
    571 F.Supp. 642 (N.D.Cal. 1983) ......................................39

**FEDERAL STATUTES**

**Securities Exchange Act of 1934**

Section 10(b)
    [15 U.S.C. § 78j(b)] ......................................................6

**Investment Advisers Act of 1940**

Section 202(a)(11)
    [15 U.S.C. § 80b-2(a)(11)] ............................................7, 32

Section 206
    [15 U.S.C. § 80b-6]......................................................7

Section 206(4)
    [15 U.S.C. § 80b-6(4)]........................ 1, 5, 8, 19, 20, 35, 36, 38

Section 206(4)-8(a)(2)
    [15 U.S.C. § 80b-6(4)-8(a)(2)] .....................................17

Section 209(e)
    [15 U.S.C. § 80b-9(e)] ..............................................40, 42

Section 209(e)(2)
    [15 U.S.C. § 80b-9(e)(2)] ...........................................43

Section 209(e)(2)(C)
    [15 U.S.C. § 80b-9(e)(2)(C)] ......................................43

**Investment Company Act of 1940**

Section 3(a)
    [15 U.S.C. § 80a-3(a)] ...............................................6

Section 3(c)(1)
  [15 U.S.C. § 80a-3(c)(1)].................................................................6
Section 3(c)(7)
  [15 U.S.C. § 80a-3(c)(7)].................................................................6

**FEDERAL REGULATIONS**

17 C.F.R. § 201.1003 .........................................................................43
Rule 10b-5
  [17 C.F.R. § 240.10b-5].................................................................31
Rule 10b-5(b)
  [17 C.F.R. § 240.10b-5(b)].............................................................15
Rule 204-3
  [17 C.F.R. § 275.204-3].................................................................26
Rule 206(4)-8 (b)
  [17 C.F.R. § 275.206(4)-8(b)] ...........................................................6
Rule 206(4)-8
  [17 C.F.R. § 275.206(4)-8]...............................................5, 19, 36, 38
Rule 206(4)-8(a)
  [17 C.F.R. § 275.206(4)-8(a)]............................................................5
Rule 206(4)-8(a)(1)
  [17 C.F.R. § 275.206(4)-8(a)(1)].....................................................1, 8
Rule 206(4)-8(a)(2)
  [17 C.F.R. § 275.206(4)-8(a)(2)]....................................................1, 34

**FEDERAL RULES OF EVIDENCE**

Federal Rule of Evidence 801 ..............................................................25
Federal Rule of Evidence 802 ..............................................................25
Federal Rule of Evidence 803 ..............................................................25
Federal Rule of Evidence 804 ..............................................................25

**COMMISSION RELEASES**

*Prohibition of Fraud by Advisers to Certain Pooled Investment Vehicles*,
  Advisers Act Release No. 2628 (Aug. 3, 2007) ................................5, 9

**ACCOUNTING STANDARDS**

Accounting Standards Codification Topic 946-320-35-1............................13

# I.   INTRODUCTORY STATEMENTS

## A.   The SEC's Introduction

The Securities and Exchange Commission ("SEC") moves for summary judgment against Defendants Tweed Financial Services, Inc. ("TFSI") and Robert Russel Tweed ("Tweed") (collectively, the "Defendants") because the undisputed evidence establishes that Defendants violated the federal securities laws in connection with a pooled investment vehicle they managed, the Athenian Fund LLC ("Athenian" or "the Fund").

Summary judgment is appropriate here on the SEC's claims that Tweed and TFSI violated Section 206(4) of the Advisers Act and Rules 206(4)-8(a)(1) and (2) thereunder.  The evidence shows that Defendants made material misrepresentations and omissions to investors regarding what assets had actually been purchased by the Athenian Fund, a pooled investment fund they managed, and the rates of return generated by the Fund.  From October 2012 to the first quarter of 2014, Defendants distributed account statements to Athenian investors that falsely represented that their investments in the Fund were showing positive returns, years after Tweed and TFSI knew that the assets were non-performing and that investors had suffered a near total loss of their capital.  In addition, Tweed employed deceptive practices by deceiving investors regarding the liquidity of the investments, while redeeming certain investors out of the Fund in preference to others.  There is no question that these misrepresentations and omissions were made, and deceptive practices occurred, and that they were materially false and misleading.  There can also be no dispute that, in engaging in this conduct, Tweed and TFSI violated the federal securities laws.

Accordingly, the SEC respectfully requests that the Court grant its motion for summary judgment and issue Final Judgments permanently enjoining Defendants from violating the federal securities laws, and ordering them to pay statutory civil penalties of $160,000 for Tweed and $775,000 for TFSI.   Alternatively, in the event that the Court determines that the SEC has not satisfied its burden as to every element

of its claims, the SEC requests that the Court grant summary judgment as to the elements of its claims that it deems have been established.

## B.    The Defendants' Introduction

The Securities and Exchange Commission ("SEC"), has filed this action based upon an offering to 24 investors almost a decade ago.   Between December 2009 and March 2010, defendant Robert Russel Tweed ("Tweed"), a registered securities broker and investment adviser, acting through his wholly-owned advisory firm, defendant Tweed Financial Services, Inc. ("TFSI") (collectively "Defendants") raised approximately $1.7 million for Athenian Fund, L.P. (the "Fund"), a limited partnership formed by Tweed in January 2008. [SS at D112]  The offering documents for the Fund show that Fund was established to invest in another fund (known as a "master fund"). [SS at P18]. The offering documents gave TFSI, as the general partner of the Fund, authority to make other investments in his discretion.   [SS at P12].  In March 2010, consistent with Tweed's discretionary authority, he directed the transfer of the funds from the original master fund to another master fund. [SS at P28].

The SEC's Motion for Summary Judgment ("MSJ"), like its First Amended Complaint ("FAC"), is based upon the quarterly reports for the period October 2012 to April 2014.  [SS at D113].   The investments for the Fund were made long before October 2012 and accordingly these reports were not  made in connection with the offer or sale of securities.  [SS at D114].  Indeed, the period chosen by the SEC was simply selected to try to avoid the Supreme Court's holding in in *Gabelli v. SEC,* 568 U.S. 442 (2013) that claims under the anti-fraud provisions of the Investment Advisers Act of 1940 seeking penalties are subject to the five-year limitations provision of 28 U.S.C. §2462. Previously, in *FEC v. Williams,* 104 F.3d 237 (9th Cir. 1996), the Ninth Circuit held that §2462 applied to both equitable and penal sanction imposed by the government.

The financial reporting at issue concerned two investments made by the Fund. The first investment was a $650,000 investment in a gold mining venture in Africa

through a fund called Quantitative Analytics Management Fund, LLC (the, "QAMF Investment"). [SS at D115].    The second was a $200,000 loan made in March 2011 to Teamwork Retail, a software start-up company (the, "Teamwork Retail Loan"). [SS at D115]. The SEC claims that Tweed failed thereafter to disclose problems with the QMAF Investment and the Teamwork Retail Loan.

Stripped of the conclusory boilerplate allegations about false and misleading statements, the actual claims asserted in the MSJ for **the period at issue (October 2012 through April 2014)**[1] are the following as to the six quarterly statements issued for Q4 2012 through Q1 2014:[2]

(1) With respect to the QAMF Investment, (a) Tweed "concealed the substantial losses" from this investment by not reflecting the fair market value of the investment [See SEC Motion in Support of Summary Judgment, etc. ("Motion") at10:3-8 and SS at ¶ 85]; (b) Tweed failed to disclose "the specific assets in which the Fund was invested, the current value of assets and investor's capital or how Net Income or ROI was calculated [Motion at 10:8-11 and SS at ¶86]; and, (c) "Investors did not receive the Statement of Operations that [Tweed] had itemizing" the investment. [Motion at 10:11-14 and SS at 87].

(2) With respect to the Teamwork Retail Loan, (a) Tweed issued account statement that valued the investment based on the full value of the loan

---

[1] The MSJ is replete with extraneous allegations about other purported events during other time periods. Tweed filed a motion to dismiss the FAC, arguing that the present action accrued earlier than October 2, 2012, i.e., earlier than five years prior to when plaintiff filed its complaint. (See Dkt. 32, Motion to Dismiss at 1-2).  In ruling on that motion, this Court that the FAC does not appear to have alleged pre-October 2012 fraudulent conduct. (See Dkt. 46, Order at 5:24-25). This Court held, "[T]he FAC does not allege that defendants engaged in fraudulent conduct prior to October 2, 2012." The Court's Order further stated that the SEC allegations as to the QAMF Investment, was based upon the quarterly statements and as to the Teamwork Retail Loan it was also based on failure to make disclosures about interest payments and the full value of that Loan.  (*Id.* at 2:10-24).

[2] By that time, many of the investors had already redeemed their investments and only 14 investors remained in the Fund. [SS at D113].

plus accrued interest after Teamwork Retail filed for bankruptcy [Motion at 11:16-19 and SS at 69], (b) Tweed did not notify investors of the Teamwork Retail bankruptcy [Motion at 11:19-22 and SS at 70] and (c) Tweed continued to reflect positive returns on investor account statements until November 2013 when Teamwork Retail's bankruptcy plan was confirmed. [Motion at 12:2-5 and SS at 72].

To the extent that the foregoing claims are pled in the FAC, they are stated at 62-71 which asserts that the quarterly statements for the period October 2012 through April 2014 were misleading.   These allegations present mixed questions of fact and law which are not susceptible  to summary judgment.

The foregoing alleged deficiencies in the quarterly statements are of two types: disputed valuations for the investments and alleged failures to disclose negative post-investment occurrences.  As to the first type of alleged deficiency, the  SEC has not cited, and cannot cite, any specific statute or regulation which required Tweed to value the Fund's portfolio any differently than he did here.  Notably, the SEC does not cite any alternative valuations it would have found acceptable.  As to the second type of alleged deficiency, the SEC has not cited, and cannot cite, any specific statute or rule that mandates the post-investment disclosures in quarterly reports that the SEC now insists should have been made by Tweed.

At trial, Tweed will present expert testimony that as to the valuations in the quarterly reports to the extent Tweed had any responsibility, it was to **consider** whether or not the investments should be written down at the time he learned of certain negative events.  [See Expert Report of Bernerd Young, JA Tab 96].   Having done so, Tweed acted in good faith in distributing the quarterly reports.  [SS at D159].

Moreover, the reports were prepared by L. Boyd Cook ("Cook"), a professional who worked at the certified public accounting ("CPA") firm of Lunsford Peck, LLC. [SS at D133].  Other professionals at Lunsford Peck participated in the preparation of the reports. [SS at D133].   It is the Lunsford Peck firm whose name appears on five of

the six quarterly statements at issue and not that of Tweed. [See JA Tabs 29-32 and 44.][3]

There are mixed questions of fact and law to be decided at trial. As the party moving for summary judgment, the SEC has the ultimate burden of persuading the court that there is "no genuine dis[ute as to any material fact and the movant in entitled to judgment as a matter of law." (Rule 56(a), Fed. R. Civ. P. The SEC has not done so. Asx the movant, it is the SEC's "heavy burden" of demonstrating the absence of any triable issue of material fact. *Ambat. v. City & County of San Francisco*, 757 F.3d 1917, 11031 (9th Cir. 2014). The SEC has not met that heavy burden. Moreover, as further explained by Defendants below, the SEC misconstrues the relevant law.

## II.   POINTS OF CONTENTION

### A.   Did Defendants Violate Section 206(4) of the Advisers Act and Rule 206(4)-8 Thereunder?

#### 1.   The SEC's Position

##### a.   The Legal Standard for a Violation of Section 206(4) of the Advisers Act and Rule 206(4)-8.

Defendants violated Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder. Section 206(4) prohibits investment advisers from, directly or indirectly, engaging in any act, practice or course of business that is fraudulent, deceptive, or manipulative. Rule 206(4)-8(a) defines such prohibited conduct to include: (1) making false or misleading statements or otherwise defrauding investors or prospective investors in pooled investment vehicles; or (2) engaging in fraudulent, deceptive, or manipulative conduct with respect to any investor or prospective investor in a pooled investment vehicle. *See Prohibition of Fraud by Advisers to Certain Pooled Investment Vehicles*, Advisers Act Release No. 2628 (Aug. 3, 2007). Scienter is not required for violations of Section 206(4) and Rule 206(4)-8; rather, a

---

[3] The remaining quarterly statement for Q1 2014 has Boyd Cook's name on it rather than Lunsford Peck. [JA, Tab 36].

showing of negligence is sufficient. *Id.* at 12-13 ("We believe use of a negligence standard also is appropriate as a method reasonably designed to prevent fraud."); *SEC v. Steadman*, 967 F.2d 636, at 647 (D.C. Cir. 1992) (scienter not required under Section 206(4)).

Rule 206(4)-8 (b) defines a "pooled investment vehicle" as any investment company as defined in Section 3(a) of the Investment Company Act, or that would be an investment company under Section 3(a) but for the exclusions provided by Section 3(c)(1) (no public offering and no more than 100 beneficial owners) or (c)(7) (no public offering and all of the investors are "qualified purchasers"). Section 3(a) of the Investment Company Act defines "investment company" as any issuer that holds itself out as being engaged primarily, or proposes to engage primarily, in the business of investing, reinvesting or trading in securities. The Athenian Fund meets this definition because it held itself out as being engaged primarily in the business of investing in securities. Joint Separate Statement of Undisputed Facts filed concurrently herewith ("SS") P15; Joint Appendix of Evidence filed concurrently herewith ("JA") Tabs 6, 50, 49. In fact, the Athenian Fund held itself out to be a pooled investment vehicle. SS at P10; JA Tabs 5, 6, 14.

To be actionable, an investment adviser's misstatements and omissions to clients must concern material facts. *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988); *TSC Indus. v. Northway*, 426 U.S. 438, 449 (1976). The standard of materiality under the Advisers Act is the same as that applied in the context of Section 10(b) of the Securities Exchange Act of 1934. *SEC v. Blavin*, 760 F.2d 706, 710-13 (6th Cir. 1985). A fact is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. *See TSC Indus.*, 426 U.S. at 449; *SEC v. Platforms Wireless*, 617 F.3d 1072, 1092 (9th Cir. 2010). "The question of materiality . . . is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, __U.S.__, 133 S. Ct. 1184, 1195-96 (2013)

*quoting TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 445 (1976)

### b.      Tweed and TFSI Are Investment Advisers

Both Tweed and TFSI are investment advisers under the Advisers Act, and thus subject to the provisions in Section 206.  Section 202(a)(11) defines an "investment adviser" as any person who, for compensation, is engaged in the business of providing advice to others or issuing reports regarding securities.  15 U.S.C. § 80b-2(a)(11).  Tweed and TFSI easily meet this definition.  Tweed established TFSI in 1992 to provide investment advisory services to his clients.  SS at P2; JA Tab 5.  TFSI was established to provide investment advisory services for Tweed's clients.  SS at P1-P2; JA Tabs 2-5.  During all relevant times to this action (2012 to 2014), TFSI was registered as an investment adviser with the state of California, and Tweed was associated with TFSI.  SS at P3-7; JA Tabs 2-5, 10, 45, 57.  Tweed holds Series 7, 24, 31, 63 and 65 securities licenses.  SS at P8; JA Tabs 12 and 50.  Tweed and TFSI managed the Athenian Fund and its investments.  SS at P10-13; JA Tabs 5, 6, 10, 13, 50.  In exchange for managing the Athenian Fund, Tweed, through TFSI, was entitled to collect a monthly management fee based on a percentage of the Athenian Fund's assets and a quarterly payment based on the performance of the fund.  SS at P14; JA Tabs 2-5, 10.  Accordingly, TFSI and Tweed were investment advisers.  *See, e.g., Abrahamson v. Fleschner*, 568 F.2d 862, 870 (2d Cir. 1977), *cert. denied*, 436 U.S. 905, and *cert. denied*, 436 U.S. 913 (1978) (general partners of investment partnership, who received salaries and percentages of net profits, generated monthly reports providing investment advice to limited partners, and controlled purchases and sales by the partnership, were investment advisers); *U.S. v. Elliott*, 62 F.3d 1304 (11th Cir. 1996) (holding managers of several investment companies who were operating a Ponzi scheme qualified as investment advisers).

### c.      Tweed and TFSI Breached Their Fiduciary Duties

The Supreme Court has held that Section 206 of the Advisers Act establishes a statutory fiduciary duty for investment advisers to act for the benefit of their clients,

including the obligation to disclose to their clients all material facts, and to employ reasonable care to avoid misleading their clients.  *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194 (1963); *Transamerica Mortgage Adviser, Inc. v. Lewis*, 444 U.S. 11, 17 (1979) ("Indeed, the Act's legislative history leaves no doubt that Congress intended to impose enforceable fiduciary obligations.").  As fiduciaries, they are required "to act for the benefit of their clients, … to exercise the utmost good faith in dealing with clients, to disclose all material facts, and to employ reasonable care to avoid misleading clients."  *SEC v. DiBella*, No. 3:04-cv-1342 (EBB), 2007 WL 2904211, at *12 (D. Conn. Oct. 3, 2007) (*quoting SEC v. Moran*, 922 F. Supp. 867, 895-96 (S.D.N.Y. 1996)), aff'd, 587 F.3d 553 (2d Cir. 2009); *see also SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194 (1963) ("Courts have imposed on a fiduciary an affirmative duty of 'utmost good faith, and full and fair disclosure of all material facts,' as well as an affirmative obligation 'to employ reasonable care to avoid misleading' his clients.").

Here, the evidence shows that Defendants violated their fiduciary obligations as investment advisers.  As set forth in detail, herein, Defendants breached these duties by material misrepresentations and omissions regarding the true nature of the Fund's investments, by misrepresenting the Funds' returns, by redeeming out certain investors in preference to others, and by failing to distribute audited financial statements for the Fund.

### d.      Tweed and TFSI Made Materially False Statements

TFSI and Tweed violated Advisers Act Section 206(4) by making false and misleading statements to investors in the Athenian Fund regarding the nature, value, and status of the Athenian Fund's holdings.  Under Rule 206(4)-8(a)(1), it is a fraudulent, deceptive or manipulative act, practice or course of business for an investment adviser to make false or misleading statements to any investor or prospective investor in a pooled investment vehicle or to fail to state material facts necessary to make statements made to such investors or prospective investors not

misleading.  *See SEC v. Rabinovich & Assocs., LP*, 2008 U.S. Dist. LEXIS 93595 (S.D.N.Y. 2008); *Prohibition of Fraud by Advisers to Certain Pooled Investment Vehicles*, Advisers Act Release No. 2628 (August 3, 2007).

From at least the fourth quarter of 2012 through 2014, TFSI, through Tweed, issued quarterly account statements to Athenian Fund investors that contained material omissions and misrepresentations.  The account statements failed to identify the assets that had been purchased by the Fund, and they included net income amounts that were based on the fiction that the Athenian Fund's investments continued to perform despite strong evidence that the assets were worthless and the principal unrecoverable.  SS at P84- P88; JA Tabs 27, 29, 30, 31, 32, 38, 42, 43, 49, 84, 85.  In addition, Tweed made false statements to investors regarding what the Athenian Fund had purchased and how it was performing.  One investor knew he was invested in the Athenian Fund, and knew he had separately invested in Teamwork Retail, but had no idea the Athenian Fund itself was invested in Teamwork Retail until 2014.  SS at P71; P89; JA Tab 49.  Rather than tell investors their money had been lost, Tweed told them their funds were "locked up for another year" or "would be released shortly."  SS at P37; P38; P83; JA Tabs 21, 49, 51, 54, 55.

### i.    False Statements and Omissions Regarding the QAMF Investment

TFSI and Tweed formed the Athenian Fund on January 22, 2008.  At all relevant times, TFSI was the general partner of the Athenian Fund as well as the Athenian Fund's investment adviser and administrator.  SS at P12; JA Tabs 5 and 50. Tweed and TFSI had discretionary authority over the fund's investments.  SS at P12-13; JA Tabs 5, 13, 50.  The Athenian Fund held itself out to investors as being engaged primarily in the business of investing in securities.  SS at P13; JA tabs 13 and 50.  Tweed and TFSI alone managed TFSI and the Athenian Fund, handling all of the investment decisions and day-to-day operations.  SS at P12, P13, P19; JA Tabs 5, 6, 13, 50.  From December 2009 to March 2010, Tweed, through TFSI, raised

more than $1.7 million from 24 investors for the Athenian Fund.  SS at P16; JA 17; 46, 50.

According to the Athenian Fund private placement memorandum ("PPM") the Athenian Fund was established as a "feeder fund" for an unrelated master fund called PMI Quant Pool 1, LLC ("PMI Quant Pool") that had been established to trade stocks using an algorithmic trading platform.  SS at P18; JA Tab 6, 50.

Tweed initially invested the Athenian Fund's capital in PMI Quant Pool, consistent with the PPM disclosure.  SS at P23; JA Tabs 17-19, 50.  In March 2010, Tweed moved all of the Athenian Fund's capital to another fund, Quantitative Analytics Master Fund ("QAMF").  SS at P24-P28; JA Tabs 8, 11, 17-19, 50, 58, 59. QAMF had been formed in February 2010 by Eric Richardson, an acquaintance of Tweed's.  SS at P24, P26-27, P29; JA Tabs 8, 11, 17-19, 50, 59.  Tweed did not disclose to investors that the new master fund would be QAMF instead of PMI Quant Pool.  SS at P30; JA Tab 51.

In October 2010, Tweed asked Richardson to return all of Athenian Fund's investment in QAMF because QAMF was generating lower than expected returns. SS at P31; JA Tabs 20 and 50.  In response, Richardson told Tweed that he had invested $650,000 of the approximately $1.7 million invested by Athenian Fund in a purported one-year note with another unrelated and unregistered entity, Luminary ("LLC L").  SS at P32-33; JA Tab 50.  Tweed never obtained a copy of the promissory note with LLC L.  SS at P34; JA Tab 50.  Thus, Tweed knew by October 2010 that a significant portion of the Athenian Fund's assets had not been invested in the manner described in the Athenian Fund's PPM.  SS at P35; JA Tab 51.  Instead of disclosing that the Athenian Fund's assets had been invested in a manner that diverged from the stated investment strategy, Tweed told certain investors only that "the money was locked up for another year."  SS at P37; JA Tabs 51 and 54.

In late 2010, Richardson returned the portion of the Athenian Fund's capital that had not been invested in the purported one-year note with LLC L to Tweed.  SS

at P36; JA Tabs 20 and 50.  But at the end of the one-year period, even though TFSI and Tweed had not received the remaining $650,000 in principal, Tweed nevertheless assured at least one investor that his money was tied up in securities and he would return his capital once those securities were liquidated -- no later than the end of 2012.  SS at P38; JA Tabs 21, 54.

No later than February 2012, Tweed learned that the FBI had executed a search warrant at Richardson's office.  SS at P39; JA Tab 50.  In February 2012, Richardson amended the QAMF operating agreement to allow the Athenian Fund and, by extension, Tweed, to co-manage QAMF.  SS at P40; JA Tabs 22, 50.  Richardson also transferred his files concerning the $650,000 investment in the LLC L one-year note to Tweed.  SS at P41; JA Tabs 11 and 50.

The documents Tweed obtained from Richardson in February 2012 included a February 17, 2012 letter in which Richardson acknowledged that $650,000 invested by Athenian Fund in June 2010 had been transferred yet again, from LLC L to a gold mining venture in Africa.  SS at P42; JA Tabs 23 and 50.  Specifically, the letter stated that these funds "were further credited or placed . . . in a nondepletable escrow account for a gold purchase contract out of Ghana, Africa."  *Id.*.

In June 2012, the U.S. Attorney's Office for the District of Utah filed felony bank fraud charges against Richardson.  SS at P43; JA Tab 12.  In July 2012, Richardson resigned as manager of QAMF and notified Tweed that he was resigning as the co-manager of QAMF due to "extraneous events."  SS at P44; JA Tabs 11 and 50.  Tweed understood that Richardson was resigning because he was being criminally prosecuted.  SS at P45; JA Tabs 11 and 50.

By September 2012, long after the purported note with LLC L should have matured, the Athenian Fund had still not received a return of its principal.  SS at P56; JA Tab 50.  Tweed continued to represent to investors that their principal was invested in securities, and did not disclose that their principal had been invested in a

gold mining venture in Ghana, under the direction of a person who had been indicted for felony bank fraud.  SS at P47, P52-P54; JA Tabs 24, 26, 50, 51, 54.

In November 2012, Richardson pleaded guilty to the bank fraud charge and was sentenced to more than one year in prison, followed by supervised release, and ordered to pay restitution.[4]  SS at P48; JA Tabs 12-13.  Tweed knew that Richardson was going to prison for fraud in November 2012.  SS at P49; JA Tab 50.  Tweed also knew by this time, that the Athenian Fund's capital had gone from QAMF, to LLC L, to a third entity that purportedly used the money to finance a gold mining operation in Ghana.  SS at P42; JA Tabs 23, 50.  He was in fact communicating directly with LLC L by November 2012.  SS at P50; JA Tab 11; 25, 50.  Even if Tweed actually believed that the money was only tied up for one year,[5] by at least late 2011, when payments failed to materialize, Tweed knew, or should have known, that collectability of the investment was doubtful.  Certainly, by November 2012, when Richardson went to prison, the collectability of the Fund's $650,000 investment in QAMF became even more unlikely.  Indeed, Tweed himself expressed concern about the collectability of the QAMF investment to the Athenian Fund's outside accountant at the time.  SS at P51; JA Tabs 52, 53.  But Defendants' communications with Athenian Fund investors in 2012 and 2013 do not reflect any of this information.

Although Tweed was unable to recover the $650,000 in Athenian Fund assets that he had placed under Richardson's management, TFSI and Tweed made no disclosures to Athenian Fund investors about QAMF, Richardson, LLC L, or the gold mining operation until April 2014.  SS at P52; JA Tabs 26, 51.  Moreover, up to the first quarter of 2014, TFSI, acting through Tweed, issued quarterly account statements to Athenian Fund investors valuing the Athenian Fund's investment in

---

[4] In May, 2013, Richardson was also enjoined for violations of the Commodities Exchange Act.  SS at P46; JA at Tab 14.

[5] According to Tweed's testimony, he was not given the details of the credit facility and did not get the contract.  *See* Tweed 8/17/16 Testimony, pp. 215 – 218.

QAMF at $777,190, including principal and accrued interest.  SS at P53; JA Tabs 27, 29-32, 38, 42, 43, 50, 51.  This valuation was maintained for eight straight quarters, until Q4 2013.  *Id.*  Finally, in the first quarter of 2014, Tweed caused the Athenian Fund to partially write down the value of the QAMF investment to the principal amount of $650,000.[6]  SS at P54; JA Tabs 50, 27 and 32.

The information in the Athenian Fund investor account statements was misleading because Tweed and TFSI omitted material information regarding the assets it had purchased with investor funds and concealed the substantial losses that resulted from those investments by inflating the value of Athenian Fund holdings and representing that they were paying returns on investment.  SS at P84-P87; JA Tabs 27, 29-32, 38, 42, 43, 50, 51. 84, 85, 49.   The statements did not disclose the specific assets in which the Fund was invested, the current value of assets and investor's capital, or how Net Income or ROI was calculated.  SS at P86-87; JA Nos. 27, 29-32, 38, 42, 43, 50, 51. 84, 85, 49.   Investors did not receive the Statement of Operations that Tweed and TFSI had itemizing the QAMF and Teamwork Retail investments as assets of the Athenian Fund.  SS at P87; JA Tabs 49, 84, 85.  They received only a single page statement reflecting their capital balance and purported net gains.  *Id.*

To date, Tweed has not recovered any part of the $650,000 placed with QAMF. SS at P55.

### ii.   False Statements and Omissions Regarding the Teamwork Retail Investment

Defendants made similar disclosure failures with respect to the second Athenian Fund investment in Teamwork Retail.  In March 2011, TFSI and Tweed caused the Athenian Fund to loan $200,000 to an entity called Teamwork Retail.  SS

---

[6] Defendants should have been valuing fund assets at fair market value, which would have required Tweed to consider the likelihood that the Athenian Fund's principal could be recovered.  *See* Accounting Standards Codification Topic 946-320-35-1 ("ASC 946") (to be in accordance with GAAP, an investment company shall measure investments at fair value).

at P60; JA Tabs 16, 50, 51.  Teamwork Retail was purportedly a software company operated by a friend of Tweed's.  SS at P57-58, P61; JA 15, 50, 55.  Tweed earned at least $105,000 in consulting fees from the company between December 2009 and December 2010.  SS at P59; JA Tabs 62 and 65.  Pursuant to the terms of the note, the Athenian Fund's loan to Teamwork Retail was supposed to earn 18% interest quarterly.  SS at P62, JA Tabs 16, 50.  However, no interest was ever paid to the Athenian Fund, and the loan was not repaid when it came due in September 2011.  SS at P63; JA Tabs 33, 50.

By 2012, Tweed knew that Teamwork Retail was experiencing financial difficulty.  SS at P64; JA Tabs 50, 51, 55.  Tweed received updates on Teamwork Retail from its president–his personal friend–every few weeks and was familiar with its financial condition.  SS at P65; JA Tab 51.  Tweed has admitted that he did not demand repayment of the loan because he knew the company could not pay back the note as it was "struggling" financially and had no assets.  SS at P66; JA Tab 51.

On June 12, 2013, Tweed received an email message from Teamwork Retail's principal notifying him that Teamwork Retail planned to file for bankruptcy.  SS at P67; JA Tab 34; 51.  Teamwork Retail filed for bankruptcy in August 2013.  SS at P68; JA Tab 35.  Documents filed in the bankruptcy proceeding reflect a debt of $284,887 to the Athenian Fund.  *Id.*  Even after Teamwork Retail filed for bankruptcy protection in August 2013, TFSI, acting through Tweed, continued to issue account statements to the Athenian Fund's investors that valued the investment based on the full value of the loan plus accrued interest.  SS at P69; JA Tab 29.  Moreover, despite his knowledge of Teamwork Retail's financial difficulties and ultimate bankruptcy filing, Tweed did not notify Athenian Fund investors or appear on their behalf in the Teamwork Retail bankruptcy.  SS at P70; JA Tab 51.  As late as June 30, 2014, Tweed told investor Graham Bruwer that he was still "waiting for an update" on the Teamwork Retail Investment.  SS at P71; JA Tab 49.

The Teamwork Retail loan came due in September 2011.  SS at P62; JA Tab

14

16.  Despite his knowledge that Teamwork Retail had never made a single payment on the loan, that it was experiencing financial difficulties and ultimately filed for bankruptcy, Tweed concealed this information from investors.  Throughout 2013, Tweed made no written or oral disclosures about Teamwork Retail's financial problems or bankruptcy filing to Athenian Fund investors.  SS at P76; JA Tab 50.  In addition, Tweed and TFSI continued to reflect positive returns on investors account statements for over two years, until November 2013, when Teamwork Retail's bankruptcy plan was confirmed.  SS at P72-P74; JA Tabs 32, 51, 61, 32.  When Tweed and TFSI finally did write down the Teamwork Retail loan in the Fourth Quarter of 2013, it caused the Athenian Fund's reported return on investment to drop nearly 20%.  SS at P74; JA Tab 32.  Teamwork Retail has repaid only $1-2,000 of the $200,000 Tweed and TFSI loaned it from the Athenian Fund.  SS at P75; JA Tab 50.

### e.   Tweed and TFSI were the "makers" of the false statements

There is can be no dispute that Tweed and TFSI were responsible for making misrepresentations and omissions to the investors.  Anyone who "makes" a misleading statement or omission, or who has "ultimate authority over" it, can be liable under Rule 10b-5(b).  *See Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011).  Tweed and TFSI were responsible for the content of the investor account statements and were responsible for mailing the misleading account statements to investors.  The Athenian Fund's outside bookkeeper Boyd Cook did the physical preparation of the investor account statements based on Tweed's representations and then emailed them to Tweed so that Tweed could mail them to investors.  SS at P94; JA Tab 52.  Tweed instructed Cook on what values to include in the account statements.  SS at P92-93; P95-96; JA Tabs 32, 52.  As the Supreme Court stated in *Janus Capital*, "[o]ne 'makes' a statement by stating it." *Janus*, 564 U.S. at 142.

**f.      The Misrepresentation and omissions were material**

These omissions and misrepresentations were material.  Defendants failed to disclose that the Athenian Fund had not purchased the PMI Quant investment and concealed the substantial losses that resulted from the QAMF and Teamwork Retail investments by representing that they were paying returns on investment.  SS at P30-P54; P60-P76.  Tweed and TFSI knew that the collectability of the QAMF investment was questionable by no later than November 2012 and Teamwork Retail by no later than June 2013, but he failed to inform investors until April 2014.  SS at P97; JA Tab 26, 51.  There can be little doubt that a reasonable investor in the Fund would want to know the accurate historical performance of the Fund, and the accurate amount of assets under management.  *See, e.g.*, *SEC v. Rabinovich & Associates, LP*, 2008 U.S. Dist. LEXIS 93595 at *8-*9 (S.D.N.Y. Nov. 18, 2008) ("Without question, an investment fund's historical rate of return is a critically material fact for a potential investor…."); *SEC v. Murphy*, 626 F.2d 633 (9th Cir. 1980) ("[s]urely the materiality of information relating to financial condition, solvency, and profitability is not subject to serious challenge"); *SEC v. Credit Bancorp, Ltd.*, 195 F. Supp. 2d 475, 292 (S.D.N.Y. 2002) ("[s]ummary judgment on matters of materiality in a securities fraud case is appropriate when the omission and misrepresentations in questions are 'so obviously important to the investor that reasonable minds cannot differ on the question of materiality.") (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 35 (2d Cir. 1978)).

In fact, investors did care.  Graham Bruwer was "upset at the lack of candor and transparency" in his communications with Tweed and eventually suspected that his "account statements did not reflect the true value of my investments, since Rusty was telling me that Teamwork was in financial trouble and yet the information his office provided was showing the full value of my initial $70,000 investment."  SS at P55; JA Tab 49.  Bruwer also complained that because of Defendants' lack of transparency, he was "filing taxes and using [his investment] to secure a loan"

16

without realizing his money was lost.  SS at P89; JA Tab 49.

### g.    Tweed and TFSI Employed Deceptive Practices

TFSI and Tweed also violated Section 206(4)-8(a)(2), when they employed practices that deceived Athenian Fund investors.  From 2010 through 2012, Tweed and TFSI made it appear as if the Athenian Fund was profitable by allowing some investors – including Tweed's stepson and TFSI's profit sharing plan, which benefited Tweed and his employees – to exit the fund with all or nearly all of their original capital when the fair value of the fund's assets would not have supported full redemption.  SS at P77-81; JA Tabs 50, 62, 67-82.  Beginning in 2012, Tweed began to deny redemptions requests by the Athenian Fund's investors because the Fund had insufficient liquidity to satisfy the requests.  SS at P82; JA Tabs 37, 50, 54, 55.  Instead of telling investors seeking redemptions that there was insufficient cash in the Athenian Fund to satisfy their requests, Tweed persuaded them to stay in the Athenian Fund or told them that the money "would be released shortly."  SS at P83; JA Tabs 49, 54, 55.

In addition, TFSI never distributed audited financial statements as required by the PPM.  SS at P 20-22; P98; JA Tabs 6, 50, 51.  Indeed, the Fund was not audited until 2014, and it was only audited because the State of California issued a deficiency letter to Tweed regarding his failure to do so.  SS at P99-101; JA Tabs 39, 50, 51.  Even after the multi-year audit was completed, Tweed did not distribute the audited financials to investors.  SS at P102 and P109; JA Tab 51.  Tweed has not had the Athenian Fund's financial statements audited since 2014.  SS at P108; JA Tab 51.

Tweed finally informed investors about the losses in the Athenian portfolio only after the chief compliance officer of Concorde, the advisory firm Tweed was associated with, which did not manage the Athenian Fund, discovered Tweed's misconduct with respect to the Athenian Fund.  SS at P103; JA Tab 40.  On April 3, 2014, Concorde directed Tweed to take certain corrective actions, including retaining fund counsel and issuing a written disclosure to Athenian Fund investors.  SS at

P104; JA Tab 41.  In a letter dated April 30, 2014, Tweed notified some investors in writing about the missing $650,000 invested in QAMF and the Teamwork Retail loan.  SS at P105; JA Tab 26.  That letter omitted several important facts, such as Tweed's personal connection to Teamwork Retail's president, his selective redemptions of certain investors including his stepson, and his advance knowledge of Teamwork Retail's bankruptcy filing.  *Id.*  In his April 30, 2014 letter, Tweed claimed that he had been working diligently since 2012 to recover the $650,000 invested in QAMF.  SS at P106; JA Tab 26.  Tweed further asserted that approximately $43,000 of the amount due from Teamwork Retail would be repaid over time to the extent funds were available from Teamwork Retail's quarterly earnings.  *Id.*  Contrary to the statements in his letter, to date, Tweed has not recovered the $650,000 investment that had been directed to the purported Ghanaian gold mining operation, and has only collected "one to two-thousand" dollars from Teamwork Retail.  SS at P107; JA Tab 50.

This failure to provided audited financials allowed TFSI to perpetrate the fraud because audited financials would have revealed the deteriorating true value of the fund investments.Thus, Tweed and TFSI failed to exercise reasonable care by providing investors materially false information about the location, liquidity and performance of their investments, and lulled investors to remain in the Athenian Fund by making preferential redemptions.  In the alternative, Tweed acted knowingly or recklessly when he provided false information to the Athenian Fund's investors about the true uses, liquidity and performance of their investments, and lulled investors to remain in the Athenian Fund by making preferential redemptions.

### h.   Defendants Cannot Claim Reliance on Professionals As a Defense

The SEC anticipates that Defendants may assert a reliance on professionals defense for the statements made in the investor account statements.  But Defendants have not and cannot make the factual showing necessary to sustain such a defense.

Defendants "must show that they (1) made a complete disclosure to [the professional]; (2) requested [the professional]'s advice as to the legality of the contemplated action; (3) received advice that it was legal; and (4) relied in good faith on that advice." *SEC v. Goldfield Deep Mines*, 758 F.2d 459, 467 (9th Cir.1985) (citation omitted); *SEC v. Retail Pro. Inc*., 2010 WL 1444993 (S.D. Cal. Apr. 9, 2010); *see also Provenz v. Miller*, 102 F.3d 1478, 1491 (9th Cir. 1996). Although Defendants may argue they hired accounting professionals, there is no evidence that Defendants consulted with a professional, made full disclosure to them, sought their advice, that any advice was received, or that any such advice was followed. To the contrary, the evidence is that Boyd Cook, the accountant from the outside firm that Tweed retained to prepare investor account statements, was not a CPA, but was a bookkeeper who relied on representations from Tweed when preparing the statements. SS at P90-P93; JA Tab 32, 52. For example, Cook testified that he kept the value of the QAMF investment unchanged for several quarters in 2012 and 2013 because he was told to do so by Tweed. SS at P95; JA Tabs 32, 52. Similarly, when Cook did ultimately write down the QAMF and Retail Teamwork investments in 2014, he did so without seeing any supporting documents, based entirely on what Tweed told him. SS at P97; JA Tabs 32, 52. Rather than Tweed relying on him, Cook relied on Tweed and TFSI in preparing the account statements.

### 2. The Defendants' Position

#### a. The Fiduciary Duty Claim was Never Pled and Accordingly Cannot be Considered on a Motion for Summary Judgment

The SEC argues that Tweed violated Section 206(4) and Rule 206(4)-8 of the Advisers Act first by breaching fiduciary duties. [Motion at 4:21-5:15]. Tweed disputes this. However, breach of fiduciary duty was not pled in the FAC. The word "fiduciary" does not appear once in the 101 paragraphs of the FAC.

19

### b.   The Claims Alleging Material False Statements Present Mixed Questions of Law and Fact to be Tried

The SEC's second argument that the Defendants violated Section 206(4) by making false and misleading statements to investors in the Fund, "regarding the nature, value and status of the [Fund's] holdings." [Motion at 5:17-19].   The SEC focuses on disclosures concerning the QAMF investment and the Teamwork Retail Loan to make this argument.   As to each, the SEC is wrong and has failed to establish the facts and law required to grant summary judgment.   "Generally, "whether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact." *Fecht v. Price Co*., 70 F.3d 1078, 1081 (9th Cir. 1995); *see also Durning v. First Boston Corp*., 815 F.2d 1265, 1268 (9th Cir. 1987) (stating that adequacy of disclosure is normally a jury question)."  *SEC v. Todd* (9th Cir. 2011) 642 F.3d 1207, 1220.

For example, the SEC's claims are based upon the argument that statements were *materially* false and misleading.  But in the leading case on materiality under the federal securities laws, *TSC Industries v. Northway,* 426 U.S. 438 (1976), the United States Supreme Court reversed the granting of a motion for summary judgment, holding:

> The issue of materiality may be characterized as a mixed question of law and fact, involving as it does the application of a legal standard to a particular set of facts. In considering whether summary judgment on the issue is appropriate, we must bear in mind that the underlying objective facts, which will often be free from dispute, are merely the starting point for the ultimate determination of materiality. The determination requires delicate assessments of the inferences a "reasonable shareholder" would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact.

*Id.* at 450.

c.  **Tweed Did Not Make False Statements or Omissions Regarding the QAMF Investment or Teamwork Retail Loan**

   i.  **Summary of the QAMF Investment in the Relevant Quarterly Reports were Not Falsely Valued**

The SEC devotes most of its argument with respect to allegedly false statements regarding the QAMF Investment to events prior to October 2012. [See Motion 6:15-8:26].

In early 2010 the investment objective of the Fund was to invest in a fund known as PMI Quant Pool 1, LLC ("PMI Pool 1"), which was managed by Portfolio Management International ("PMI"), a group in Salt Lakes City, Utah that had developed a software system for trading. PMI was expected to open an account for the Fund with Trade Station, a specialized brokerage firm.   [SS at D116]. PMI was expected to open an account for the Fund with Trade Station, a specialized brokerage firm.  Initially, that was done. [SS at D116].

After the Fund placed its funds with PMI Pool 1, a question arose as to whether PMI Pool 1 had the requisite license(s) with Utah.  Tweed located another fund, QAMF which he understood had an identical arrangement with PMI executing the same trading strategy through an account at Trade Station.  [SS at D117].  In or about March 2010, the Fund's investment was moved to QAMF to continue to implement the originally planned trading strategy at Trade Station.  [SS at D118].   At the time, QAMF was managed by Eric Richardson ("Richardson").  [SS at D119].

In or about May 2010, Tweed learned that PMI had determined to place investments for which it had been trading into cash temporarily to retool its software trading program.  At the time, Richardson advised Tweed that, rather than having the QAMF funds remain in cash, some of the QAMF Fund assets were being placed in a Wells Fargo "credit facility" where they could earn "extra" interest while waiting for

PMI to restart its trading program. [SS at D120].  When PMI had not restarted its trading program by the Fall of 2010,  Tweed sought a return from QAMF of all funds it had received from the Fund.  [SS at D121]. All of  the funds except for $650,000 were returned.  [SS at D122]. Richardson advised Tweed that the $650,000 was illiquid at the time. [SS at D123].[7] Tweed provided truthful information to various investors who raised questions about these investments. Tweed did not solely tell these investors that "the money was locked up for another year." [SS at D123].

The $650,000 had been used by Richardson as part of an indirect investment in a gold mining venture in Africa. [SS at D125].  It had been transferred to a partnership identified to Tweed as Luminary Investment Services for which an individual named Mohammed Ibrahim ("Ibrahim") was the general partner and thereafter invested with an entity known as Enex Capital Partners LP ("Enex") which in turn invested in the foregoing gold mining venture.  [SS at D126].

Ibrahim advised Tweed that in 2013 the Fund had obtained certain rights to a large piece of mining equipment, which had been secured and was being marketed for Lease.  Tweed was told by Ibrahim that the money was, "still coming back" and there was just a delay.  [SS at D127].    Tweed received a statement from Ibrahim which reflected a fair market value for the equipment and a balance due and payable from Enex.[8]  Tweed shared that statement with Lunsford Peck promptly upon receipt. [SS at D128].

For some time, including through at least Q1 2014, Tweed believed that recovery over time of some or all of the $650,000 was possible to the extent that the foregoing

---

[7] The PPM for the Fund had advised investors that at time assets in the Fund might be illiquid. [SS at D124].

[8] Tweed shared that statement with Lunsford Peck at or about the time Tweed received it. [SS at D129].

equipment could be leased or sold and further that any shortfall would be paid.  [SS at D130].

### ii.    The QAMF Investment was Reasonably Valued Reasonably

Previously, in opposing Defendants' Motion to Dismiss on statute of limitation grounds, the SEC took the position that the allegations in the FAC regarding misrepresentations and omission relate solely to those since October 2012.  [Dkt. No. 33, SEC's Opposition to Defendants' Motion to Dismiss, etc. at 2:9-12].   The Order denying the Motion to Dismiss accordingly focused solely on the quarter statements issued between October 2012 and April 2014.  Accordingly, the SEC's discussion of pre-October 2012 activities is irrelevant.[9]

The only allegedly false statement in the relevant quarterly statements accordingly to the SEC is that for the five statements from the last quarter of 2012 through the last quarter of 2013, was that Tweed did not write-down the value of the QAMF investment.  [Motion at 9:18-23 and 10:6].  The SEC acknowledges that the investment was written down in the first quarter of 2014.  [Motion 9:23-10:2].  Neither in the Motion, nor in the FAC, does the SEC state what the SEC believes the quarterly statements should have reflected as the value for the QAMF Investment.  Nor does the SEC in its Motion provide any other value that the SEC claims should have been used on the quarterly statements, nor does the SEC provide any expert opinion that the value reflected on the quarterly statements was unreasonable or incorrect.

---

[9] If pre-October 2012 events are part of the alleged violation, the entire action must be dismissed on the of limitation grounds pursuant to *Gabelli v. SEC,* 568 U.S. 442 (2013) (applying five year repose period of 28 U.S.C. §2462  to SEC penalty action for fraud).  Indeed,  the very fact that the SEC in its Motion relies so heavily on pre-October 2012 events makes the application of §2462 an issue which cannot be resolved on summary judgment, notwithstanding that this Honorable Court declined to dismiss the pleading on those grounds.

### d.    The Quarterly Statements were Prepared by Certified Public Accountants – Not by Tweed

By contrast, the quarterly statements as sent to the investors reflected the values set forth by Lunsford Peck, certified public accountants.  [SS at D131].  The SEC claims that the statements were prepared by Boyd Cook ("Cook") a bookkeeper hired by the Fund who merely repeated the on representations from Tweed.  [SS at Ps 90-94].  **This is a disputed fact.**  That dispute alone defeats the SEC's Motion.  Tweed hired Lunsford Peck, certified public accountants to prepare quarterly financials and the quarterly statements to investors. [SS at D132]. That engagement included all five quarterly statements at issue.  (Q4 2012 through Q4 2013).  [SS at      D132].  Cook testified that he assisted with the preparation of both quarterly financials and quarterly statements, but he was only one of the people that worked on them at Lunsford & Peck. [SS at D133].  He testified that he was employed at Lunsford Peck at the time with the duties of a manager. [SS at D134].  Cook's email to Tweed reflects that Cook is acting on behalf of Lunsford Peck as does his email address. [SS at D135].

Indeed, when the SEC attorney attempted in her questioning to have him testify that he prepared quarterly statements, he corrected her and said they were prepared by Lunsford & Peck. [SS at D136].

Moreover, the statements for Q4 2012 through Q4 2013, state on their face that they were prepared by "Lunsford & Peck Certified Public Accountants". [SS at D137]. In an email to Tweed from Cook identifying what Lunsford & Peck has been engaged to do, it specifically identifies the preparation of monthly or quarterly financial statements.  [SS at D135].

At all times relevant, Cook, on behalf of Lunsford Peck, knew that these statements were for distribution to Fund investors.  [SS at D138].

i.      **The QAMF Investment Valuations on the Quarterly Reports Were Reasonable**

Lunsford Peck's valuation reflected in their quarterly statements which TFSI distributed was not unreasonable.  In an expert report prepared for the Defendants' in this case, Bernerd Young,[10] the Defendants' expert,[11] explained in part:

In 2011[12], Luminary Investment Services ("LIS") in its account statement to QAMF noted that they had obtained the deed to a piece of industrial machinery, with a fair market value of $400,000. The QAMF ownership of this equipment was 59.09%, or approximately $236,360. This equipment was located in Denver, CO and was expected to generate revenue as a result of an equipment lease to a mining company. The additional QAMF investment in LIS, beyond the $236,360 deed value in the expected revenue generating industrial equipment, was listed in the form of cash.

My review disclosed numerous e-mails (in excess of 25) between Mr. Tweed and QAMF, LIS and others wherein he was attempting to

---

[10]      Mr. Young is currently the Chief Executive Officer of MGL Consulting, LLC, a position he has held for ten years.   Mr. Young has more than 35 years' experience in the financial services industry, encompassing securities compliance, regulatory, brokerage and banking disciplines. Mr. Young spent 19 years with FINRA (formerly NASD). He advanced to the position of District Director 6 (Dallas). As District Director, Mr. Young was responsible for the preparation, execution and disposition of the District Office portion of the national examination program, implementation of the Membership Application Program, and liaison to the District Nominating Committee, the District Committee, the Small Firms Advisory Board and Advisory Council. He has spoken at numerous SIFMA seminars, an SIA Small Firms Conference, SEC annual conferences, an AARP National Conference, as well as FINRA national conferences and regional seminars.  [JA 95].  Mr. Young's resume and full report are attached to the Declaration of Bernard Young ("Young Decl.") as [JA 95 and 96].

[11] Plaintiff SEC objects to the admissibility of any of the statements in the expert report of Bernerd Young as inadmissible hearsay.  Mr. Young is not a percipient witness to any of the events at issue and his report is not sworn testimony offered under penalty of perjury.  Fed. R. Evid. 801-802. No exception to the hearsay rule applies.  Fed. R. Evid. 803-804.

[12] The reference to 2011 should be 2013 [SS at D94]

determine the status of the investments and acting in the best interest of the QAMF investors.  [SS at D139][13]

Cook testified that he continued to rely on the value of the QAMF Investment as first reflected by information provided by Eric Richardson and then by Mr. Ibrahim, not just what Tweed may have reported.   [SS at D141].   Cook continued to use the full value they reported until a  determination was made that some portion of the QAMF investment would not be collectible.  [SS at D142].

In connection with the issuance of the Quarterly Reports, Tweed specifically asked Gabriel and/or Cook about the appropriate valuation of the QAMF Investment. [SS at D143].  Tweed was assured by one or both of them that the valuations reflected in the Quarterly Reports were appropriate until when, and if, another specific value was known. At the time the Quarterly Reports were issued no other specific value was known by Tweed.  [SS at D143].

Cook testified that the appropriate time to change the valuation would be if there came a time that they knew the money was not coming and all collection processes had taken place, i.e., when they knew it was truly a lost asset. [SS at D144].   That did not happen until after 2013.  [SS at D144].

The SEC's argument that Richardson's going to jail for an unrelated matter necessitated a reduction in the valuation of the QAMF investment ignores the fact that even before the period in question, Richardson no longer had any involvement with the QAMF investment.   [SS at D145].[14]   The investment had already been made.

---

[13] Tweed has confirmed the factual accuracy of the facts set forth in that quotation. [SS at D140].

[14] In *SEC v. Lowe,* 556 F. Supp. 1359 (E.D.N.Y. 1983) the Court held that the publisher of a newsletter was not required by the Investment Adviser Act rules to disclose the criminality of its owners, holding, ". Advisers Act Rule 204-3, 17 C.F.R. § 275.204-3 (1982), which requires certain disclosure to advisory clients, conspicuously fails to require disclosure of Part I of Form ADV, containing a recital of any administrative or judicial determinations of misconduct against the adviser. It

Richardson had turned over his role or  control to the Defendants and/or Ibrahim had already replaced any prior role Richardson had with respect to the investment.  [SS at D145]. Moreover, Cook testified that he learned that Richardson was going to jail from both Tweed and the news.  [SS at D146].  Since it is reasonable to infer that the news reports occurred at or about the time of the event, it may be concluded that Cook knew the fact at or about the time it occurred.  Cook, and therefore, Lundsford Peck, timely knew all of this and made a professional judgment not to reduce the valuation.  [SS at D147].  The SEC offers no expert opinion that this was wrong.

Tweed himself testified that he did not consider impairing the QAMF Investment when he learned Richardson was going to jail as Tweed was told  that the money was, "still coming back" and there was just a delay.  As support for that, Ibrahim gave Tweed a statement show that he was holding a lien on the equipment or title to the equipment that would itself be for most of  the outstanding money.  [SS at D148].

Moreover, the Quarterly Reports did not purport to be audited and could not be held to the standards of an audited financial.  Indeed, each report specifically contained the following caveat:

> "This is a confidential statement. It is not an obligation to pay, nor any form of legal contract….We have not audited, reviewed or  otherwise verified the provided numbers and, accordingly, do not express an opinion or any other form of assurance with respect to them."

[SS at D149].

### ii.    Summary of the Teamwork Retail Loan

In in March 2011 the Fund invested $200,000 in a six-month promissory note with Teamwork Retail, a software company, in an effort to generate short-term returns

---

would be patently unfair to hold defendants accountable under the anti-fraud provisions of section 206 for failure to disclose when the reporting rules are silent on any such requirement and may even imply the absence of such a requirement." *Id.* at 1370.

to cover certain Fund expenses.  [SS at D150].   Tweed was familiar with Teamwork Retail and its business and associated risks, as a result of having previously assisted Teamwork Retail with certain capital raising activities and as a Teamwork Retail investor. Based on his experience and knowledge of its business, Tweed believed at the time the loan was appropriate as an investment.  [SS at D151].

Teamwork Retail  did not repay the loan when it initially became due or on any of the subsequent maturity date extensions. [SS at D152].  On or about August 13, 2013 Teamwork Retail filed for bankruptcy protection.   The Teamwork Retail bankruptcy petition listed the Fund as a creditor with a $284,887.67 claim.  [SS at    D153].  At various times, in response to questions about one or more investments, Tweed advised the investors about the bankruptcy. [SS at D153]. In or about November 2013, Tweed learned that the Bankruptcy Court had reduced the loan obligation of Teamwork Retail to the Fund through the bankruptcy to $43,500. [SS at D154].

As a result of the Teamwork Retail Bankruptcy and various corporate changes, Retail Cloud Technology, LLC ("Retail Cloud") became the successor to Teamwork Retail.   Retail Cloud assumed the responsibility for paying the $43,500 obligation of Teamwork Retail to the Fund.  Retail Cloud is continuing to make payments on that obligation.  Tweed currently anticipates that the obligation will ultimately be paid in full.  [SS at D155].

### iii.   The Teamwork Retail Loan was Reasonably Valued

As discussed above, the quarterly reports at issue were prepared by certified public accountants.  The Defendants' expert provides the following opinion as to the reporting of the  Teamwork Retail Loan:

> It is also my opinion that Mr. Tweed acted reasonably even though he did not "write-down" the value of the Fund's investments in Teamwork during the period of the 4th quarter of 2012 through the 3rd quarter of 2013. It is not my belief, nor am I aware of any guidance promulgated by

28

the SEC, that the anticipation of a bankruptcy filing by Teamwork would automatically require a write-down or write-off of the Fund's promissory note with Teamwork. During the Teamwork Chapter 11 Re-Organization Bankruptcy filing, the U.S. Bankruptcy Judge Hon. K. Rodney May, of the Middle District of Florida, accepted the full value of the promissory note, including accrued interest, as an obligation of Teamwork. The Bankruptcy Court, issued its "Order Approving Disclosure Statement on Final Basis and Confirming Plan, as Modified" on November 14, 2013. This Order stated that the Class 6 Holders (of which The Athenian Fund was a member) would receive a one-time cash payment of up to $1,000 and 15% of their Allowed Claim (which, in the case of the Athenian Fund was approximately $285,282) in payments over time. A review of the Athenian Fund general ledger discloses Mr. Tweed wrote down the Teamwork Retail promissory note to $43,500 (or 15% of the face value of the note, as submitted to the bankruptcy court) on November 14, 2013, the same day as the bankruptcy's final approval. This value is then reflected value on the 4th Quarter 2013 and 1st Quarter 2014 Athenian Fund statements issued to investors. [15]

The Defendants' expert, Mr. Young, also has opined that the SEC's argument (implicit in the Motion, although not actually articulated as such) that the Teamwork Retail Loan should have been written down earlier because it was somehow improper to reflect positive returns based on interest on the loan which had not been received in cash, is erroneous.   Mr. Young  correctly opines:

> It is my opinion that the Teamwork Retail investment was paying returns, and thus not required to be written down. For example, rather than paying

---

[15] The facts set forth in the opinion quoted are supported by the Declaration of Russell Tweed [SS at D156].

29

the interest to the note holder in cash, the accumulated, but unpaid interest during the quarter was added to the principal amount of the note. This is evidenced by the account statements received from Teamwork which included both the principal amount and the recent quarter's interest. It is my understanding that, even though the promissory note had not been amended, both Teamwork and Mr. Tweed agreed that the accrued interest would be added to the principal amount. Thus, the note was effectively "paying returns as scheduled". In addition, it is also my belief that the note was paying returns as scheduled, since the Teamwork Chapter 11 Re-Organization bankruptcy included the note in its full amount, comprised of both $200,000 principal and approximately $84,000 in accrued interest, as part of Teamwork's bankruptcy resolution.[16]

### iv.    There were No Material Omissions in the Quarterly Reports

The SEC also argues that the quarterly reports omitted certain material information.  [Motion at 10:3-14].   The argument misconstrues the purpose of the quarterly reports.  They were limited to providing  valuations – nothing more.   As discussed above, the valuations provided in them by the CPAs were reasonable.   The reports were voluntary. The PPM noted that they were issued in the discretion of the General Partner[17].  [SS at D157].

The SEC has cited no rule or regulation mandating the quarterly reports or anything that was included in them.   In *SEC v. Lowe, supra,*  the Court held:

The SEC's authority to require of investment advisers on-going disclosure

---

[16] The facts set forth in the opinion quoted are supported by the Tweed Decl. [SS at D156].

[17] Although the PPM provided for a monthly management fee payable to TFSI (not to Tweed personally), during the period at issue (Q4 2012 through Q1 2014), neither TFSI nor Tweed received any compensation with respect to the Fund.  Indeed, Tweed put in his own money to pay the Fund expenses. [SS at D157].

1    derives from section 204 of the Advisers Act, 15 U.S.C. § 80b-4 (1976).
2    This section does not authorize the SEC to prescribe ad hoc disclosure
3    requirements. Section 204 explicitly provides that any record and report
4    obligation imposed by the SEC must be prescribed by rule; disclosure
5    requirements must be of general application.

6    *Id.* at 1370.

7            e.     **Defendants Were Not the Authors of the Quarterly**
8                   **Reports -- Whether Either of the Defendants Qualified**
9                   **as a "Maker" Is a Triable Issue**

10           The SEC asserts that Tweed, "instructed Cook on what values to include in the
11   account statements." [Motion at 12:21-22]. **This is a disputed fact.** That dispute
12   alone defeats the SEC's Motion.

13           In *Janus Capital Group, Inc. v. First Derivative Traders* (2011) 564 U.S. 135,
14   the Supreme Court held that in a private Rule 10b-5 action, an investment adviser could
15   not be liable for securities fraud where the adviser was not the "maker" of the allegedly
16   false statement.   Here, after citing the limitations imposed by *Janus,* the SEC argues
17   that Tweed was the "maker" of the allegedly false quarterly reports as Tweed was
18   responsible for mailing them and he instructed Cook on what values to include in them.
19   [Motion at 12:12-24].   But Tweed contends that the "maker" of the statements for
20   2012Q4 through 2013Q4 was Lunsford Peck and for 2014 Q1 it was Boyd.  Lunsford
21   Peck prepared all of these statements, except for the 2014Q1 statement. Its name
22   appears on those statements. [SS at D158]. In the 2014Q1, that name is replaced by
23   Cook's.   Tweed received the statements before they were sent out, but he did <u>not</u>
24   instruct the accountants what to put in them. [SS at D159].  Lunsford Peck and Cook,
25   not either of the Defendants, are the "makers."  While the SEC disputes this that simply
26   makes this a triable issue of mixed fact and law.

27

28

### f.     Materiality Is a Triable Issue.

In *TSC Industries v. Northway, supra,* the United States Supreme Court reversed the granting of a motion for summary judgment, held that the determination of whether a fact is material, "requires delicate assessments of the inferences a "reasonable shareholder" would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact. *Id.* at 450.   The SEC's Motion fails to provide that assessment  except to argue that one investor, having already made his investment decision, complained of "lack of transparency" as it impacted non-investment decision concerns. (i.e., taxers and a loan). [Motion at 12:23-25].

Moreover, for the period at issue, they were no investment decisions to be made. The quarterly reports simply described the value of pre-existing investments.

### g.     Reliance on Professionals Is a Triable Issue

The Defendants relied on Lunsford Peck as certified public accountants and Boyd Cook individually as a professional accountant with respect to preparing and issuing the quarterly reports. [SS at D160].  Contrary to the assertion by the SEC that "there is no evidence that Defendants consulted with a professional, made full disclosure to them [sic], sought their [sic] advice, that any advice was received, or that any such advice was followed." [Motion at 16:3-5]. Tweed contends that all of these criteria were met. [SS at D161].

### h.     Whether the Defendants were "Investment Advisers"
### with Respect to the Matters at Issue Is a Triable Issue

The SEC argues that both Tweed and TFSI were "investment advisers" under the Advisers Act subject to Section 206. [Motion at 3:26-27].  There is no dispute that during the period relevant to this action (Q4 2012 through Q1 2014), TFSI was registered as an investment adviser with the State of California and Tweed was associated with TFSI.  [SS at P 3-7]   However, as to the disclosures of the applicable quarterly statements, neither TFSI nor Tweed were acting as investment advisers.  [SS

at D162].   In its Motion, the SEC explains Section 202(a)(11) of the Adviser's Act defines an investment adviser  as, "any person who, for compensation, is engaged in the business of providing advice to others or issuing reports as to securities." [Motion at 3:27-4:1].  During the period at issue (Q4 2012 through Q1 2014),  neither TFSI nor Tweed received any compensation with respect to the Fund.   [SS at D163].   Neither TFSI nor Tweed were providing advice to any of the investors about whether or not to make any investment decisions relating to the Fund at the time of Quarterly Reports were distributed to investors.   [SS at D164].  As discussed above, the reports were prepared by Lunsford Peck and Cook, whom the Defendants assert issued the reports.

The cases cited by the SEC on the issue of the status of the Defendants are distinguishable.  In *Abramson v. Fleshner,* 586 F.2d 862 (2d Cir. 1977), *cert. denied,* 436 U.S. 906 and 436 U.S. 913 (1978), the general partner defendants were receiving compensation (*Id.* at 870); here that is not true for the Defendants with respect to the time at issue. In *U.S. v. Elliott,* 62 F.3d 1304 (11th Cir. 1996), is also distinguishable because the criminal defendants in that case received compensation for providing investment advice.  (*Id.* at 1311).  Here whatever compensation Tweed and/or TFSI received, it was not for the period at issue.

In addition as to Tweed individually,  the SEC argues that the  he was an "investment adviser" because he was associated with TFSI and because he holds certain securities licenses. [Motion 3:26-27,  and 4:5-8].   That alone is insufficient for summary judgment.  In *Wallent v. Bendelac (In re Bendelac)* 2005 Bankr. LEXIS 3484, 2005 Bankr. LEXIS 3484 (Bankr.S.D.N.Y. 2005), the Court  held that the Debtor was not an investment adviser, notwithstanding that the Debtor was an executive officer and director of a corporation which had filed a form 10-KSB with the SEC identifying itself as a registered investment advisory firm, the where the Debtor testified that the corporation was actually only a broker/dealer at the relevant time and that the Debtor personally was simply a registered broker with a securities license.  The Court held:

Plaintiffs  have  not  demonstrated  either  the  necessary  facts  or  the  legal

> guidance that would persuade this Court that the Debtor should be considered an investment adviser for the purposes of the Investment Advisers Act. The Debtor testified that he did not act as an investment adviser in his capacity as an officer or director of Laidlaw, stating that he was "simply a broker." 3/23 Tr. at 154-155. The Debtor may have received substantial compensation from Laidlaw, but it was not shown that Debtor's compensation from Laidlaw was directly related to providing investment advice.

*Id.,* 2005 Bankr. LEXIS 3484, at *49.   See also, *Wang v. Gordon,* 715 F.2d 1187, 1192 (7th Cir. 1983) (Defendant general partner was not an investment adviser under §202(a)(11) of the Adviser's Act where he was compensated for selling partnership property but not for information regarding securities.)

### i.      The Defendants Did Not Employ Deceptive Devices

The central argument advanced by the SEC on this MSJ against the Defendants as to allegedly employing deceptive practices [Motion 13:2-15:19] begins by arguing about activities between 2010 and 2012.   As discussed before, the time period is irrelevant.   The thrust of the remaining allegations focus on an argument that the Defendants were hiding problems concerning the investments.   But, even the SEC admits that during the applicable period, the quarterly statements reflect a write-down of the Teamwork Retail Loan to $43,000. [SS at P73].   Moreover, by letter dated April 30, 2014, Tweed provided a detailed explanation of the status of both investments. [SS at D165].

The SEC also complains that the Defendants did not issue annual audited reports as provided in the PPM.   [Motion at 14:12-13].   The Defendants had a Fund audit done at the end of 2014.   When that audit was done, it covered the period 2008 through 2013.   Fund audits were not done earlier because of cost issues.   There was no intent to defraud.   [SS at D166].

The SEC relies upon Regulation 206(4)-8(a)(2) to argue that the Defendants,

34

"employed practices that deceived [Fund] investors." [Motion at 13:27-28].[18]  While the SEC's Adopting Release claims that negligence suffices for a violation of the statute, that argument exceeds not only the scope of the language of the regulation  but also the language of Section 206(4) pursuant to which the regulation was adopted. Thus,   in the *Concurrence of Commissioner Paul Atkins* to the adoption of the regulation, Commissioner Atkins appropriately reasoned:

> The language of Section 206(4) does not reach negligent conduct. Section 206(4) makes it unlawful for an advisor "to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative" and directs the Commission "by rules and regulations [to] define, and prescribe means reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative." . . . As the Supreme Court has said, however, "it is a 'familiar principle of statutory construction that words grouped in a list should be given related meaning.'"[19]10 Hence, it is inappropriate to base a conclusion that negligent conduct is reached by looking at the term "deceptive" apart from its companion terms. In the Section 10(b) context, the Supreme Court has accorded special significance to the term "manipulative": Use of the word

---

[18] The regulation at 17 C.F.R. 275.206(4)-8(a) provides: "<u>Prohibition</u>. It shall constitute a fraudulent, deceptive, or manipulative act, practice or course of business within the meaning of section 206(4) of the Act (15 U.S.C. 80b-6(4)) for any investment adviser to a pooled investment vehicle to: (1) Make any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to any investor or prospective investor in the pooled investment vehicle; or (2) Otherwise engage in any act, practice, or course of business that is fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in the pooled investment vehicle."

[19] Citing, *Schreiber v. Burlington Northern, Inc.* 472 U.S. 1, 8 (1985) (quoting *Securities Industry Assn. v. Board of Governors*, *FRS,* 468 U.S. 207, 218 (1984).

"manipulative" is especially significant. It is and was virtually a term of art when used in connection with securities markets. It connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities.[20] The language of Section 206(4), like the language of Section 10(b), would seem then to suggest a scienter requirement.

**B.     Did Tweed Aid and Abet TFSI's Violations?**

**1.     The SEC's Position**

Tweed aided and abetted TFSI's violations of Advisers Act Section 206(4) and Rule 206(4)-8.  To establish aiding and abetting liability, the Commission must show "(1) the existence of an independent primary violation; (2) actual knowledge by the alleged aider and abettor of the primary violation and of his or her own role in furthering it; and (3) 'substantial assistance' by the defendant in the commission of the primary violation."  *SEC v. Fehn*, 97 F.3d 1276, 1288 (9th Cir. 1996); *see also SEC v. Apuzzo*, 689 F.3d 204, 211 (2d Cir. 2012).

Here, the first element is met because, as discussed above, TFSI directly violated Section 206(4) of the Advisers Act and Rule 206(4)-8.  Next, Tweed acted with the requisite mental state and provided substantial assistance in TFSI's violation. Tweed knew that contrary to the PPM, the Athenian Fund had made illiquid investments in gold mining equipment and a promissory note to a struggling software company.  Yet in preparing TFSI's account statements to investors, Tweed failed to disclose these material departures from the Athenian Fund's stated investment strategy.  Tweed also knew or was reckless in not knowing that he was providing misleading and/or inaccurate information about the value of the Athenian Fund's assets to its investors.

---

[20] Citing, *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 19 (1976) and *Aaron v. SEC*, 446 U.S. 680, 691 (1980).

Tweed obtained QAMF documents from 2012 that showed that QAMF had transferred $650,000 to an illiquid mining venture. SS at P42, P52; JA Tabs 23, 26, 50, 51.  Tweed nevertheless continued issuing account statements from TFSI based on valuing QAMF at $777,190 until the first quarter of 2014, when he allowed the asset to be partially written down to $650,000—an amount Tweed himself doubted was collectable and still has never been able to collect.  SS at P51, P53; JA Tabs 27, 29-32, 38, 42, 43, 50, 51, 52.

Tweed also was aware that the value of Athenian Fund's investment in Teamwork Retail was not performing because he received regular updates of its financial condition from the president of Teamwork Retail.  SS at P64-P65; JA Tabs 50, 51, 55.  Through these updates, Tweed learned about Teamwork Retail's deteriorating financial condition long before it filed for bankruptcy.  Indeed, Tweed admits that he did not demand repayment of the Teamwork Retail loan after it became due in September 2011 because he knew that Teamwork Retail was struggling financially.  SS at P66, JA Tab 51.

Operating through TFSI, Tweed caused account statements to be issued to the Athenian Fund investors that were materially false and misleading information about the actual uses and liquidity of their investment monies, and the performance of their Fund accounts.  SS at P84, P85, P87; JA Tabs 27, 29-32, 38, 42, 43, 49, 50, 51, 52, 84, 85.  Tweed and TFSI failed to disclose to investors that the Athenian Fund's assets were not invested in securities, but had instead been invested in an illiquid Ghanaian gold mining venture and in his friend's bankrupt software startup.  SS at P52, P69, P70; JA Tabs 26, 29, 51.  Tweed instructed the accountant who prepared the investor account statements to reflect positive returns on these investments long after they had ceased performing.  SS at P93-96; JA Tabs 32, 52.  In short, Tweed acted recklessly by distributing account statements that reported stale information despite his awareness of facts, such as Richardson's indictment on fraud charges and

Teamwork Retail's impending bankruptcy, tending to cast doubt on the ultimate collectability of the Athenian Fund's investments.

Tweed also substantially assisted TFSI in its deceptive conduct by authorizing selective redemptions that advantaged some investors over others and made false assurances as to when investors' funds would become liquid.

Tweed knew of or recklessly disregarded TFSI's violations, and knew of or recklessly disregarded his own role in furthering these violations. Tweed therefore substantially assisted TFSI in its violations of Section 206(4) and Rule 206(4)-8 thereunder.

### 2.    The Defendants' Position

The Defendants concur with the SEC that to establish aiding and abetting liability, the SEC must show, "(1) the existence of an independent primary violation; (2) actual knowledge by the alleged aider and abettor of the primary violation and of his or her own role in furthering it; and (3) 'substantial assistance' by the defendant in the commission of the primary violation." [Motion at 17:4-8].

The SEC has not established the foregoing elements sufficiently to prevail on a MSJ. First, as discussed above, the SEC has not demonstrated that TFSI directly violated Section 206(4) or Rule 206(4)-8.

Second, the SEC has not demonstrated that Tweed had "actual knowledge" of the primary violation or of his purported role in furthering it. At all times relevant Tweed believed that the quarterly statements provided appropriate valuations. [SS at D167]. Tweed was advised by Lunsford Peck that they quarterly statements they prepared were appropriate. [SS at D167]. He was specifically advised that the quarterly statements did not violate any accounting rules or otherwise violate the law. [SS at D167]. Promptly after he came to believe that full recovery of the different investments was apparently not likely, the Quarterly Reports reduced the value reported for each investment. [SS at D167].

In Q4 2010 the quarterly report reduced the value of the QMAF investment from

1    $777,190 to $650,000.   [SS at P54].

2    Tweed promptly advised Cook when the Bankruptcy Court advised that the

3    allocation for repayment of the Teamwork Loan had been reduced to approximately

4    $43,000 and the next quarterly reflected that. [SS at D21].   That amount is still in the

5    process of collection.   [SS at D155].

6    Not only did Lunsford Peck prepare the quarterly reports for the values that were

7    reflected, but the firm's subsequent <u>audited</u> financials for the Fund issued December

8    2014 supported those numbers. [SS at D168].   Thus, those <u>audited</u> financials reflected

9    the QAMF Investment at December 31, 2012 as a $776,040 asset which was only

10   reduced to $650,000 as at December 31, 2013. [SS at D168].   Similarly, those same

11   audited financials reflected the Teamwork Retail Loan as a $200,000 asset as at

12   December 31, 2012 and only reduced that asset to $43,500 as at December 31, 2013.

13   [SS at D168].   To accept the SEC's argument that Tweed *knowingly* aided and abetted

14   issuing false quarterly reports going back to 2012,  one must conclude that he knew

15   more about accounting valuations than Lunsford & Peck did when it completed its audit

16   with all the knowledge it had by year end 2014 and, since this is a motion for summary

17   judgment, that conclusion must be that no reasonable jury could conclude otherwise.

18   Clearly, that standard has not been met.

19   Finally, the SEC has failed to demonstrate "substantial assistance" in a primary

20   violation.  Any claim by the SEC that Tweed did so by causing the quarterly statements

21   to be distributed fails.  As discussed thoroughly above, the statements were prepared

22   by Lunsford Peck and Cook. [SS at D137]. TFSI had agreed in its discretion to send

23   them out.  Moreover, the SEC's argument for aiding and abetting is that "Tweed caused

24   account statements to be issued." [Motion at 18:7-8].   The claim is impermissibly

25   vague.  It would encompass the ministerial act of mailing or some other ministerial

26   assistance.  Ministerial assistance is insufficient to prove aiding and abetting under the

27   federal securities laws.  See, e.g., *Brant v. CCG Financial Corp.* (D.Or. 1988) 693

28   F.Supp. 889, 894 (Granting a motion to dismiss, the Court held, "These are ministerial

1    tasks and do not provide substantial assistance in any wrongdoing as required to prove

2    liability for aiding and abetting  a violation under section 10(b) of the Securities Act.

3    Beyond the bare and conclusory allegation that IIC knew of alleged wrongdoing, Brant

4    has failed to allege any specific facts that would satisfy the requirement that IIC play

5    some active role in the alleged wrong.”);  W*right v. Schock* (N.D.Cal. 1983) 571

6    F.Supp. 642, 663. (Granting a defense motion for summary judgment in a securities

7    case, the Court held, “The performance of mere "ministerial tasks" is insufficient to

8    establish aiding and abetting liability.”).

9            **C.    The SEC’s Request for Permanent Injunctions**

10                   **1.    The SEC’s Position**

11           Permanent injunctions are warranted against TFSI and Tweed.  Section 209(e)

12   of the Advisers Act provide that when the evidence establishes a reasonable

13   likelihood of a future violation of the securities laws, a permanent injunction shall be

14   granted in enforcement actions brought by the SEC.  *Murphy*, 626 F.2d at 633; *SEC*

15   *v. Koracorp Indus., Inc.*, 575 F.2d 692 (9th Cir. 1978); *SEC v. Fehn*, 97 F.3d 1276,

16   1295-96 (9th Cir. 1996).  Factors to be considered include the degree of scienter

17   involved; the isolated or recurrent nature of the infractions; the defendant’s

18   recognition of the wrongful nature of his conduct; the likelihood that, based on the

19   defendant’s occupation, future violations might occur; and the sincerity of the

20   defendant’s assurances against future violations.  *Id.*  Here, the totality of the

21   circumstances weighs in favor of permanent injunctions against both Defendants.

22           Tweed failed to exercise reasonable care by providing investors materially

23   false information about the true uses, liquidity and performance of their investments,

24   and lulled investors to remain in the Athenian Fund by making preferential

25   redemptions.  In the alternative, Tweed acted knowingly or recklessly, and his

26   scienter can be imputed to TFSI.  *See In re ChinaCast Educ. Corp. Sec. Litig.*, 809

27   F.3d 471, 476 (9th Cir. 2015) (scienter of senior controlling officers may be imputed

28   to corporation); *SEC v. Manor Nursing Ctrs.*, 458 F.2d 1082, 1096-97, n.16-18 (2d

Cir. 1979).

In addition, Defendants' conduct extended over a period of years, and there is no evidence that they have recognized the wrongful nature of their conduct, nor provided any assurances against future violations.  In fact, Tweed is likely to violate the securities laws in the future, because he intends to keep working as an investment advisor.  Tweed has already been barred by FINRA for his conduct in connection with the Athenian Fund, but rather than accepting responsibility for his actions, he has appealed that decision and continues to fight this litigation.  SS at P110-111; JA Tabs 47, 48.

The Court should therefore enter permanent injunctions against future violations against both Tweed and TFSI.

### 2.    The Defendants' Position

The SEC's request for a permanent injunction cannot be decided on the record presented by the MSJ.   A permanent injunction not only is important in its own right, but also has substantial collateral impacts on anyone in the securities industry.   To obtain a permanent injunction, the SEC "had the burden of showing there was a reasonable likelihood of future violations of the securities laws." *SEC v. Murphy,* 626 F.2d 633, 655 (9th Cir. 1980 (citations omitted).  In *SEC v. Fehn,* 97 F.3d 1276 (9th Cir. 1996), the Ninth Circuit, quoting *Murphy, supra,* explained:

> In "predicting the likelihood of future violations," we must assess "the totality of the circumstances surrounding the defendant and his violations," and we consider such factors as
>
> > (1) the degree of scienter involved; (2) the isolated or recurrent nature of the infraction; (3) the defendant's recognition of the wrongful nature of his conduct; (4) the likelihood, because of defendant's professional occupation, that future violations might occur; (5) and  the sincerity of his assurances against future violations.

1   *Id.* at 1295-96.

2        These factors can only be fully evaluated at trial.  For example, with respect to

3   scienter, as discussed above, Tweed did not act knowingly or recklessly with respect

4   to the alleged violation of the Adviser's Act.   The SEC's argument in its discussion of

5   its request for a permanent injunction is inconsistent on this issue.  First, the SEC

6   conclusively states the Tweed "failed to exercise reasonable care." [Motion at 19:19-

7   22].  Then, the SEC argues, in the alternative. That he acted "knowingly or recklessly."

8   The inconsistent (alternative) arguments, suggest that the level a scienter, if any,

9   remains an open question for trial.

10        Another important factor for determining whether  a permanent injunction

11   should be granted, is the Court's evaluation of the sincerity of the Defendants'

12   assurances against future violations.  This should mandate a trial here.  Thus in *SEC v.*

13   *Kotrozo,* 2006 U.S. Dist. LEXIS 96795 (C.D. Cal. 2006), the Court denied permanent

14   injunctions based upon believing the assurances of the Defendants not to violate

15   applicable law.   Tweed has provided those assurances here by declaration.  [SS at

16   D169].   The merit of the assurances presents a triable issue.

17        The likelihood of future violations presents another triable issue, particularly

18   because Tweed's status in the securities industry is uncertain.   [SS at D169].

19        **D.**        **The SEC's Request for Civil Penalties**

20              **1.**   **The SEC's Position**

21        Substantial civil penalties are warranted against Tweed and TFSI.  Tweed and

22   TFSI violated the Advisers Act, and so are liable for civil penalties under Section

23   209(e) of the Act.  *See* 15 U.S.C. § 80b-9(e).  Civil penalties are meant to punish

24   wrongdoers and to deter them and others from future securities law violations.  *See*

25   *SEC v. Kenton Capital*, 69 F. Supp. 2d 1, 17 (D.D.C. 1998).  The deterrence of

26   securities law violations through the imposition of monetary sanctions serves several

27   important goals, including encouraging investor confidence, increasing the efficiency

28   of financial markets, and promoting the stability of the securities industry.  *See SEC*

1    *v. Palmisano*, 135 F.3d 860, 866 (2d Cir. 1998).

2          Under Section 209(e) of the Advisers Act, the amount of any civil penalty

3    "shall be determined by the court in light of the facts and circumstances."  15 U.S.C.

4    § 80b-9(e).  Because civil penalties, like permanent injunctions, are imposed to deter

5    the wrongdoer from similar conduct in the future, in assessing civil penalties, courts

6    frequently apply the factors set forth in *SEC v. Murphy*, 626 F.2d at 633, used to

7    establish the need for injunctive relief.  *See*, *e.g.*, *SEC v. Abacus Int'l Holding Corp.*,

8    No. C 99–02191, 2001 WL 940913, at *5 (N.D. Cal. Aug.11, 2001).  Those factors

9    are:  (i) the degree of scienter involved; (ii) the isolated or recurrent nature of the

10   infraction; (iii) the defendant's recognition of the wrongful nature of his conduct; (iv)

11   the likelihood, because of the defendant's professional occupation, that future

12   violations might occur; and (v) the sincerity of his assurances against future

13   violations.  *See Murphy*, 626 F.2d at 655; *see also SEC v. CMKM Diamonds, Inc.*,

14   635 F. Supp. 2d 1185, 1192 (D. Nev. 2009).

15         The Advisers Act provides that penalties should be assessed according to a

16   three-tier system.  *See* 15 U.S.C. § 80b-9(e)(2).  Third-tier penalties apply to

17   violations that (i) involve "fraud, deceit, manipulation, or reckless disregard of a

18   regulatory requirement" and (ii) "directly or indirectly resulted in substantial losses or

19   created a significant risk of substantial losses to other persons."  *Id*. § 80b-9(e)(2)(C).

20   For third-tier penalties involving violations that occurred between 2012 and 2014, the

21   statutory amount, adjusted for inflation, is $160,000 for natural persons and $775,000

22   for entities.  *See id*. § 80b-9(e)(2)(C); 17 C.F.R. § 201.1003 (SEC rule setting forth

23   the inflation adjustments).

24         Here, each of the *Murphy* factors weighs heavily in favor of imposing a third-

25   tier penalty on Tweed and TFSI.  Defendants conduct extended over a period of years

26   and resulted in significant harm to investors.  There is no evidence that they have

27   recognized the wrongful nature of their conduct, nor have they provided any

28   assurances against future violations.

### 2. The Defendants' Position

As to penalties, the SEC cites the same factors for consideration as apply to the granting or denial or permanent injunctions.  [Motion at 21:10-16].   For the reason discussed above with respect to the request for an injunction, an evaluation of these factors mandates trial.

Moreover, Tweed has an absolute right to a jury trial with respect to penalties. See *United States v. Tull,* 481 U.S. 412, 424-425 (A court in equity may not enforce civil penalties.  If a legal claim is joined with an equitable claim, the right to jury trial on the legal claim, including all issues common to both claims, remains intact.).

As to the amount of a penalty if any, the SEC has with little, if any analysis argued for a third-tier penalty.  The SEC fails to explain why that should apply.  The SEC argues that a third-tier penalty would be appropriate if the violation were with applicable scienter and resulted in substantial losses or the risk of loss to other persons.  Scienter, is a triable issue here.  The allegedly inaccurate valuations in the quarterly reports from Q4 2012 to Q1 2014 (the central claimed violation in this  case) could not have caused any losses.   The investments had already been made by Q4 2012.


DATED: July 17, 2019                    Respectfully submitted,


                                        /s/ Lynn M. Dean
                                        Lynn M. Dean
                                        Attorney for Plaintiff
                                        Securities and Exchange Commission


                                        /s/ Edward Gartenberg
                                        Edward Gartenberg
                                        Attorney for Defendants
                                        Tweed Financial Services, Inc. and Robert
                                        Russel Tweed

44

**PROOF OF SERVICE**

I am over the age of 18 years and not a party to this action.  My business address is:

[X]   U.S. SECURITIES AND EXCHANGE COMMISSION, 444 S. Flower Street, Suite 900, Los Angeles, California 90071

     Telephone No. (323) 965-3998; Facsimile No. (213) 443-1904.

On July 17, 2019, I caused to be served the document entitled **PARTIES' JOINT SUBMISSION FOR PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MOTION FOR SUMMARY JUDGMENT** on all the parties to this action addressed as stated on the attached service list:

[ ]   **OFFICE MAIL:**  By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices.  I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

     [ ]   **PERSONAL DEPOSIT IN MAIL:**  By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service.  Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

     [ ]   **EXPRESS U.S. MAIL:**  Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

[ ]   **HAND DELIVERY:**  I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

[ ]   **UNITED PARCEL SERVICE:**  By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which I deposited in a facility regularly maintained by UPS or delivered to a UPS courier, at Los Angeles, California.

[ ]   **ELECTRONIC MAIL:**  By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

[X]   **E-FILING:**  By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

[ ]   **FAX:**  By transmitting the document by facsimile transmission.  The transmission was reported as complete and without error.

     I declare under penalty of perjury that the foregoing is true and correct.

Date:  July 17, 2019          /s/ *Lynn M. Dean*
                                   Lynn M. Dean

**SEC v. Tweed Financial Services, Inc. & Robert Russel Tweed**
**United States District Court – Central District of California**
**Case No. 2:17-CV-07251-FMO-E**

SERVICE LIST

EDWARD GARTENBERG
egartenberg@gghslaw.com
MILENA DOLUKHANYAN
mdolukhanyan@gghslaw.com
Gartenberg Gelfand Hayton LLP
15260 Ventura Boulevard, Suite 1920
Sherman Oaks, California 91403
Telephone: (213) 542-2100
Facsimile: (213) 542-2101
*Attorneys for Defendants Tweed Financial Services, Inc. and Robert Russel Tweed*